******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* BILLY RAY JONES
## (SC 20261)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

### *Syllabus*

In accordance with *State* v. *Patterson* (276 Conn. 452), a trial court in a criminal case must issue a special credibility instruction to the jury when a jailhouse informant testifies about inculpatory statements made by a fellow inmate to the informant while they were incarcerated together.

Convicted, after a jury trial, of the crimes of murder, carrying a pistol without a permit, and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to the Appellate Court, claiming, inter alia, that the trial court improperly denied his request for a special credibility instruction concerning the testimony of jailhouse informants as it related to one of the state's key witnesses, S. At trial, the state presented no physical evidence linking the defendant to the victim's murder or to the firearm used, instead relying on the testimony of S, among other witnesses. S had approached the police more than two years after the shooting while he was in pretrial detention on two felony charges, hoping for a favorable disposition on his pending charges in exchange for information about the victim's murder. S told the police that he had seen the defendant when he was visiting the housing complex where the victim was murdered on the night in question and that, shortly thereafter, had heard gunshots. S also told the police that he and the defendant were watching television together the day after the shooting when S, who was holding a handgun, confessed to shooting the victim. The defendant requested that the trial court give a special credibility instruction concerning S's testimony in accordance with this court's decision in *Patterson*. The trial court denied the defendant's request and, instead, issued a general credibility instruction. On appeal, the Appellate Court affirmed the judgment of conviction, concluding, inter alia, that the defendant was not entitled to the special credibility instruction that he had sought because S did not testify about a confession the defendant made to him while they were fellow inmates but, rather, about events he had witnessed and a confession that had been made outside of the prison environment. On the granting of certification, the defendant appealed to this court. *Held* that the Appellate Court incorrectly determined that the trial court had properly denied the defendant's request for a jailhouse informant instruction: a defendant is entitled to a special credibility instruction regarding jailhouse informants when the informant was incarcerated at the time he approached the police with information regarding a defendant's inculpatory statements and testifies at trial about those statements, regardless of where the statements were made, and, because S was incarcerated when he approached the police about the defendant's confession in exchange for leniency in his own pending criminal matters, he was a jailhouse informant for whom a special credibility instruction was required; moreover, the trial court's denial of the defendant's request to give such an instruction was not harmless, as the state presented no physical evidence linking the defendant to the victim's murder or the firearm used in the commission of that offense, the trial court's general credibility instruction did not fully inform the jury of the factors it could consider in evaluating S's credibility, and the only evidence corroborating S's testimony regarding the defendant's confession was the testimony of another witness who suffered from credibility problems; accordingly, this court reversed the judgment of the Appellate Court and remanded the case for a new trial.

(*One justice concurring separately; three justices
dissenting in one opinion*)

Argued December 17, 2019—officially released December 1, 2020**

### *Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of murder and carrying a pistol without a permit, and, in the second part, with criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Kavanewsky, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Alvord* and *Eveleigh, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed; new trial.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, former state's attorney, and *Michael A. DeJoseph, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. In *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), we held that a trial court must issue a special credibility instruction when a jailhouse informant testifies because such informants have "a powerful incentive, fueled by self-interest, to implicate falsely the accused," and, "[c]onsequently, [their] testimony . . . is inevitably suspect." Id., 469. A "classic jailhouse informant is a witness who has testified that the defendant has confessed to him or had made inculpatory statements to him while they were incarcerated together." *State* v. *Diaz*, 302 Conn. 93, 99 n.4, 25 A.3d 594 (2011). The question presented in this certified appeal is whether the Appellate Court correctly held "that the special credibility instruction required in *State* v. *Patterson*, [supra, 452], was not applicable to an incarcerated informant who offered his testimony that the defendant confessed to him when they socialized *outside of prison* in exchange for favorable treatment of the informant by the state . . . ." (Emphasis added.) *State* v. *Jones*, 331 Conn. 909, 202 A.3d 1023 (2019). We answer the certified question in the negative and reverse the judgment of the Appellate Court.

The jury reasonably could have found the following facts. On the evening of June 21, 2010, the victim, Michael Williams, was shot to death with a nine millimeter pistol outside of the Charles F. Greene Homes housing complex (Greene Homes housing complex) in Bridgeport. When the police arrived to investigate the shooting, they found twenty to thirty people in the area where the victim's body was found, but these potential witnesses were unwilling to cooperate with the police investigation.[1]

Four days after the victim's murder, Bridgeport police detective John Tenn interviewed the defendant, Billy Ray Jones. During the video-recorded interview, the defendant informed Tenn that he had not known the victim and was not in Bridgeport on the night of the victim's murder. The defendant stated that he was in Norwalk on June 21, 2010, visiting his childhood friend, Benjamin Beau. Tenn later questioned Beau, who denied that he was with the defendant on the night in question. Tenn also interviewed the defendant's ex-girlfriend, Chanel Lawson, who informed Tenn that the defendant knew the victim.

There were no further developments in the investigation until years later, when two cooperating witnesses approached the state with information regarding the victim's murder. The first witness, Angela Teele, gave the police information in September, 2012, after she was "picked . . . up" on drug charges. Teele told the police that she had been a resident of the Greene Homes housing complex at the time, a friend of the victim, and an eyewitness to his murder. On the night of June 21,

2010, Teele saw the defendant approach the victim on the playground outside of the Greene Homes housing complex dressed in blue shorts and a black hoodie. The defendant "threw his hood on," walked up to the victim, and shot him once in the back of the head with a pistol. The defendant then "[r]an out [of] the playground."

The second witness, Larry Shannon, approached the police with information regarding the victim's murder in February, 2013, when he was in pretrial detention on two felony charges. Shannon told the police that he was visiting the Greene Homes housing complex on the night of the victim's murder when he saw the defendant, whom he had known for about two or three months, dressed in jeans and a black hoodie. The defendant was "hooded up," which Shannon found to be suspicious because "[i]t was nice outside." Soon afterward, Shannon heard gunshots. He tried to run away, but he fell down due to a recent surgery on his Achilles tendon. Shannon met up with his stepbrother, who was a resident of the Greene Homes housing complex, and they "walked around the corner, and [the victim] was . . . slumped on the   . . .  playground."

The next day, on June 22, 2010, Shannon encountered the defendant at the Marina Village housing complex in Bridgeport. A "news clip came on the [television] about [the victim's] murder," and the defendant admitted to Shannon that he "did it." According to Shannon, the defendant was holding a silver, nine millimeter Ruger handgun when he confessed to Shannon that he "walked up to [the victim] and said, what's poppin' now," and then fired. No one else was present at the time of this conversation.

The defendant subsequently was arrested and charged with murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a). At the defendant's jury trial, the state relied primarily on the testimony of Teele and Shannon, as described in the preceding paragraphs, to establish the defendant's commission of the crimes charged. Additionally, the state presented the testimony of Beau and Lawson,[2] as well as portions of the defendant's video-recorded interview with Tenn, to contradict the defendant's statements that he was in Norwalk on the night of the murder and that he did not know the victim. The state did not present any physical evidence linking the defendant to the victim's murder or the firearm used in the commission of the offense, which the police never recovered.

Defense counsel argued to the jury "that this is a case that really comes down to the reliability and believability, or the lack thereof, of two witnesses: Angela Teele and Larry Shannon." In light of the importance of Shannon's testimony, defense counsel cross-examined

Shannon extensively regarding his motive for coming forward with information about the victim's murder. Shannon admitted that he had contacted the police in the hope of trading information for "favorable treatment on [his] jail situation . . . ." Shannon further admitted that he received the favorable treatment for which he bargained. Although he was in pretrial detention on two felony offenses, he was released without having to pay a bond shortly after contacting the police. Additionally, Shannon was not sentenced to any jail time in connection with the two felony charges, even though he was on probation when he committed those offenses and someone with Shannon's criminal background typically would receive a more severe sentence.

At the conclusion of the trial, defense counsel requested a special credibility instruction with respect to Shannon's testimony in accordance with *State* v. *Patterson*, supra, 276 Conn. 469–70.[3] The defendant contended that a jailhouse informant instruction was warranted because Shannon "was incarcerated and awaiting trial for felony charges when he first provided information to the police," testified that he "provided such information to the police because he wanted to get out of jail and because he hoped to receive a favorable disposition [on] his pending criminal charges," and, "in fact, received . . . these benefits as a result of the information he provided to the police in February, 2013." The state did not object to the requested instruction, but the trial court declined to issue it. Instead, the trial court issued a general credibility instruction[4] and singled out Shannon's testimony for special consideration because he previously had been convicted of felony offenses.[5]

After the case was submitted to the jury for deliberation, the jury asked to review the testimony of Teele and Shannon. The jury also asked the trial court to replay the defendant's June 25, 2010 video-recorded interview with Tenn, as well as Lawson's testimony. After reviewing the requested information and deliberating further, the jury found the defendant guilty of the charged offenses. The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of fifty years of imprisonment.

The Appellate Court affirmed the defendant's judgment of conviction. *State* v. *Jones*, 187 Conn. App. 752, 754, 770, 203 A.3d 700 (2019). The Appellate Court determined that the defendant was not entitled to a jailhouse informant instruction pursuant to *State* v. *Diaz*, supra, 302 Conn. 101–102, and *State* v. *Salmond*, 179 Conn. App. 605, 627–28, 180 A.3d 979, cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018), on the ground that Shannon "did not testify as to a confession that the defendant made while they were fellow inmates." *State* v. *Jones*, supra, 761. Because "Shannon testified about events

that he had witnessed and a confession that took place while both of them were socializing outside of the prison environment"; id., 762; the Appellate Court determined that the trial court's "general credibility instruction [was] sufficient."[6] Id., 764.

On appeal, the defendant contends that he was entitled to a jailhouse informant instruction because Shannon was an incarcerated witness who had a strong incentive to fabricate false testimony regarding the defendant's confession to the commission of the crimes charged.[7] The defendant points out that Shannon was in pretrial detention at the time he approached the police with information and that Shannon expected to— and, in fact, received—special favor from the state in exchange for his testimony. The state responds that Shannon was not a jailhouse informant for whom a special credibility instruction was required because, unlike "a jailhouse confession, which easily can be fabricated and is difficult to meaningfully cross-examine," testimony about a confession that occurred outside of prison is "not easily fabricated," may be "meaningfully tested by cross-examination, and [is] subject to comparison with other evidence in the case." We agree with the defendant and, therefore, reverse the judgment of the Appellate Court.

The general rule is that "a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." (Internal quotation marks omitted.) *State* v. *Diaz*, supra, 302 Conn. 101. "This court has held, however, that a special credibility instruction is required for three types of witnesses, namely, complaining witnesses,[8] accomplices[9] and jailhouse informants." (Footnotes altered.) Id., 101–102. With respect to jailhouse informants, we have explained that a special credibility instruction is required because "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant . . . is inevitably suspect." *State* v. *Patterson*, supra, 276 Conn. 469. "As the United States Supreme Court observed [almost seventy] years ago, '[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility.' " Id., quoting *On Lee* v. *United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952). Accordingly, courts have allowed criminal defendants "broad latitude to probe [informants'] credibility by cross-examination" and to have "the credibility issue [submitted] to the jury *with careful instructions*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Patterson*, supra, 469. These careful instructions include an advisement that the testimony of a jailhouse informant should "be reviewed with particular scrutiny and weighed . . .

with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) Id., 465.

In *State* v. *Arroyo*, 292 Conn. 558, 567, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), we held that "*Patterson*'s requirement for a special credibility instruction . . . should be extended to apply to the testimony of all jailhouse informants," regardless of whether the informant has "received a promise of a benefit" from the state. We reasoned that "there have been a number of high profile cases involving wrongful convictions based on the false testimony of jailhouse informants" and that "the expectation of a [r]eward for testifying is a systemic reality . . . even [when] the informant has not received an explicit promise of a reward. In addition, several commentators have pointed out that jailhouse informants frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., 567–69. "In light of [the] growing recognition of the inherent unreliability of jailhouse informant testimony, we [were] persuaded that the trial court should give a special credibility instruction to the jury whenever such testimony is given, regardless of whether the informant has received an express promise of a benefit." Id., 569. In guiding the jury's assessment of witness credibility in this particular context, we indicated that "the trial court may ask the jury to consider: the extent to which the informant's testimony is confirmed by other evidence; the specificity of the testimony; the extent to which the testimony contains details known only by the perpetrator; the extent to which the details of the testimony could be obtained from a source other than the defendant; the informant's criminal record; any benefits received in exchange for the testimony; whether the informant previously has provided reliable or unreliable information; and the circumstances under which the informant initially provided the information to the police or the prosecutor, including whether the informant was responding to leading questions." Id., 570–71.

Nonetheless, a criminal defendant does not have an automatic or absolute right to the issuance of a jailhouse informant instruction. Although the trial court is required to give such an instruction when a proper request to charge has been submitted, the trial court does not commit plain error if it fails to give the instruction sua sponte, so long as "the court has instructed the jury generally on the credibility of witnesses" and the jury is aware of the witness' motivation for testifying. *State* v. *Ebron*, 292 Conn. 656, 675–76, 975 A.2d 17 (2009), overruled in part on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011); see also *State* v. *Diaz*, supra, 302 Conn. 95 (holding that trial court did not commit plain error when it failed to issue, sua sponte, jailhouse informant instruction regarding

the testimony of three witnesses "who were involved in the criminal justice system and, therefore, may have had a personal interest in testifying for the state").

With these principles in mind, we consider the issue presented by this case, which is whether a trial court properly rejects a criminal defendant's request to charge the jury regarding the special credibility principles governing jailhouse informant testimony when an informant, who was incarcerated at the time he or she approached the police with information regarding the defendant's commission of the crimes charged, testifies at trial as to an alleged confession that the defendant made outside of the prison environment. Although we have not previously addressed this question, we discussed when a jailhouse informant instruction is required in *State* v. *Diaz*, supra, 302 Conn. 99–114, as part of our plain error review and analysis of whether to exercise our supervisory authority. In that case, the defendant, Luis Diaz, was convicted of fatally shooting a man outside of a bar in Bridgeport. Id., 95. Three witnesses offered inculpatory information about the defendant's commission of the crime in exchange for beneficial treatment in their own pending criminal matters. Id., 95–96. Two of the witnesses were eyewitnesses to the shooting. Id., 96–97. The third witness, Eddie Ortiz, testified that he had witnessed the shooting and that Diaz had made inculpatory statements to him while the two men were "placed in the same holding cell . . . ." Id., 96; see id. (Ortiz testified that Diaz "said to him, '[y]ou know what I did' and 'I know where you live at' " and "offered him $5000 not to testify"). With respect to the first two witnesses, we noted that "*Patterson* has not been applied to require a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that he or she witnessed outside of prison, as distinct from confidences that the defendant made to the witness while they were incarcerated together." Id., 102. Accordingly, we observed that it "would be an expansion of *Patterson*" to require a jailhouse informant instruction and opined that the failure to give the special credibility instruction concerning these two eyewitnesses could not have been plain error because it "would not have been improper even if [Diaz] had requested such an instruction." Id., 104. As for Ortiz, who testified both as to events that he observed outside of prison as well as inculpatory statements that Diaz made while the two men were fellow inmates incarcerated together, we explained that, even if we "assume[d] that the trial court's failure to give a special credibility instruction for Ortiz would have been improper under *Arroyo* if [Diaz] had requested such an instruction, the court's failure to do so sua sponte did not rise to the level of reversible plain error under *Ebron* because the trial court gave a general credibility instruction and the jury was made aware of Ortiz' motivation for testifying."

Id., 104–105.

We also rejected Diaz' alternative claim "that this court [should] exercise its supervisory power to instruct the trial courts that they must give a special credibility instruction whenever a witness in a criminal case is incarcerated or is serving out a sentence, or otherwise is in a position to receive a benefit from the state in exchange for testifying, as long as there is some additional evidence indicating that the witness is not wholly reliable or that he expects some benefit from this testimony." Id., 106. We acknowledged "that some of the same concerns that gave rise to our decision in *Arroyo* are present whenever a witness is in a position to receive a benefit from the government" but disagreed that "these concerns are as weighty in cases [in which] the witness is not testifying about a jailhouse confession, but is testifying about events concerning the crime that the witness observed. Testimony by a jailhouse informant about a jailhouse confession is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence." Id., 109. "In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested." Id., 110. This reasoning led us to "decline [Diaz'] request that we exercise our supervisory powers to instruct the trial courts that they must give a special credibility instruction in every such case." Id., 111. We emphasized, however, that "the trial courts . . . have the discretion to give a special credibility instruction" whenever they reasonably believe "that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel." Id., 113. "In determining whether to give such an instruction, the trial court may consider the circumstances under which the witness came forward; the seriousness of the charges with which the witness has been charged or convicted; the extent to which the state is in a position to provide a benefit to the witness and the potential magnitude of any such benefit; the extent to which the witness' testimony is corroborated by other evidence; the importance of the witness' testimony to the state's case; and any other relevant factor." Id.

*Diaz* delineates a clear distinction between a "classic jailhouse informant," who testifies regarding inculpatory statements that the defendant made while the informant and the defendant were "incarcerated together"; id., 99 n.4; and an incarcerated witness who offers testimony "about events concerning the crime that the wit-

ness observed" outside of prison. Id., 109. For the former category of witnesses, the trial court is required to give a jailhouse informant instruction pursuant to *Patterson* and *Arroyo*, whereas "cross-examination and argument by counsel are far more likely to be adequate tools for exposing the truth" with respect to the latter type of witness, and, consequently, a jailhouse informant instruction is not required. Id., 110.

The witness in the present case, Shannon, fits neither category of witness described in *Diaz* because he is neither the "classic jailhouse informant" nor an incarcerated witness whose testimony is solely about events he observed outside of prison. Whether the holdings in *Patterson* and *Arroyo* apply to Shannon, an incarcerated witness who testified about inculpatory statements that the defendant made outside of prison, is a question of law, over which we exercise plenary review. See, e.g., *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 738–39, 183 A.3d 611 (2018). We conclude that the logic and policy driving our precedent compel the conclusion that *Patterson* and *Arroyo* apply to witnesses, like Shannon, who were incarcerated at the time they offered or provided testimony regarding a defendant's inculpatory statements, regardless of the location where those statements were made.

As the foregoing discussion of *Patterson*, *Arroyo*, and *Diaz* makes clear, a special credibility instruction is required for jailhouse informants because (1) they "have an unusually strong motive to implicate the accused falsely"; *State* v. *Patterson*, supra, 276 Conn. 470 n.11; (2) confession evidence "may be the most damaging evidence of all"; (internal quotation marks omitted) id.; and (3) false confessions are easy to fabricate, but difficult to subject to "meaningful cross-examination . . . ." *State* v. *Diaz*, supra, 302 Conn. 109. These factors coalesce to create an impermissible risk of "wrongful convictions based on the false testimony of jailhouse informants." *State* v. *Arroyo*, supra, 292 Conn. 567. Indeed, false confession evidence from informants "is *the* leading factor associated with wrongful convictions in capital cases" and "a major factor contributing to wrongful convictions in noncapital cases." (Emphasis in original.) J. Roth, "Informant Witnesses and the Risk of Wrongful Convictions," 53 Am. Crim. L. Rev. 737, 744 (2016). Incarcerated witnesses who trade information regarding a defendant's confession for favorable treatment from the state not only have "deep conflicts of interest" that result in "the least credible type of evidence," but they also offer testimony that is "among the most persuasive to jurors because [they] typically allege to have personally heard defendants confess their guilt to the crimes charged. Introduction of a defendant's confession, from any source, radically changes the complexion of a case, particularly one lacking other evidence that directly implicates the defendant in the crime." R. Covey, "Abolishing Jailhouse

Snitch Testimony," 49 Wake Forest L. Rev. 1375, 1375 (2014).

The grave risks posed by false confession testimony from incarcerated informants, and the difficulty of mitigating those risks through meaningful cross-examination, do not depend on the location where the alleged false confession occurs.[10] Regardless of whether a criminal defendant's alleged confession takes place inside or outside of prison, the incarcerated informant offering such testimony has a strong personal motive to fabricate a false confession, which by its nature would be difficult, if not impossible, to undermine effectively through cross-examination. As one scholarly commentator has observed, such false confession evidence is "difficult to impeach effectively because it is invariably of the 'he said-she said' variety. As long as the [incarcerated informant] can plausibly testify that he had an opportunity—no matter how fleeting—to speak with the defendant, the [informant's] claim that the defendant confessed to him is practically unverifiable. Defense counsel can impugn the credibility of the [informant], but many criminal defendants—especially defendants with a criminal history—go into a jury trial with their own credibility highly suspect and will often be unlikely to come out on top in any swearing contest."[11] Id., 1401–1402.

As the dissent notes, the United States Supreme Court observed, in *United States* v. *Henry*, 447 U.S. 264, 274, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), that there are " 'powerful psychological inducements to reach for aid when a person is in confinement.' " The dissent focuses too narrowly on how these inducements may prompt an incarcerated defendant "to speak to another inmate about his crimes" when the correct analysis examines the manner in which the self-serving inducements may incentivize an incarcerated witness to fabricate false confession evidence. The dissent's erroneous focus misapprehends the fundamental purpose and function of the special credibility instruction, reflected in our own precedents, which is not to alert the jury to the possibility of an involuntary or coerced confession but, instead, to caution the jury that a jailhouse informant's testimony must "be reviewed with particular scrutiny and weighed . . . with [great] care" in light of the witness' "powerful motive to falsify his or her testimony . . . ." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 465, 469; see also *State* v. *Diaz*, supra, 302 Conn. 102–103 ("[t]he rationale for requiring a special credibility instruction . . . is that . . . the testimony of [a jailhouse] informant, like that of an accomplice, is inevitably suspect" (internal quotation marks omitted)); *State* v. *Arroyo*, supra, 292 Conn. 569 (recognizing "the inherent unreliability of jailhouse informant testimony").

The inherent unreliability of jailhouse informant testi-

mony, combined with the endemic problems of proof, has prompted "at least eighteen states" to require "some corroboration of jailhouse informant testimony to support a conviction . . . ." *State* v. *Marshall*, 882 N.W.2d 68, 83 (Iowa 2016), cert. denied,      U.S.     , 137 S. Ct. 829, 197 L. Ed. 2d 68 (2017). Connecticut has now joined many of its sister states by enacting legislation, specifically, No. 19-131 of the 2019 Public Acts (P.A. 19-131), governing the admission of "jailhouse witness" testimony in criminal trials. Justice Palmer's recent concurring and dissenting opinion in *State* v. *Leniart*, 333 Conn. 88, 215 A.3d 1104 (2019), thoroughly describes that legislation and the critical safeguards that it implements: "That legislation, among other things, requires that prosecutors who intend to introduce the testimony of a jailhouse witness disclose certain information to defense counsel, including the complete criminal history of the jailhouse witness, any pending charges, any cooperation agreement between the state and the witness, any benefits offered or provided by the state to the witness, the substance, time and place of any statement allegedly given by the defendant to the witness, the substance, time and place of any statement given by the witness implicating the defendant in the charged offense, whether, at any time, the witness recanted any testimony subject to disclosure, and information concerning any other criminal prosecution in which the jailhouse witness previously testified or offered to testify. See P.A. 19-131, § 1. In addition, the legislation establishes a statewide system for recording and tracking information on the use of jailhouse witnesses. See P.A. 19-131, § 3." *State* v. *Leniart*, supra, 164–65 (*Palmer, J.*, concurring in part and dissenting in part).

The legislature's concern regarding reliability in this particular context was great enough to prompt the enactment of heightened procedural safeguards to ensure judicial scrutiny of such testimony as a condition of evidentiary admissibility, as Justice Palmer's concurring and dissenting opinion describes: "[P]erhaps most significantly, under P.A. 19-131, in cases involving murder, murder with special circumstances, felony murder, arson murder, sexual assault in the first degree, aggravated sexual assault in the first degree, and aggravated sexual assault of a minor, and, upon motion of the defendant, the trial court must conduct a hearing to decide whether a jailhouse witness' testimony is sufficiently reliable to be admissible. See P.A. 19-131, § 2. The legislation further provides that, unless the prosecutor can establish by a preponderance of the evidence that the witness' testimony is reliable, the court shall not allow the testimony to be admitted. See P.A. 19-131, § 2. Finally, in making its determination concerning the reliability of the witness' testimony, the court is required to consider the factors enumerated in P.A. 19-131, § 1, as well as the following factors: '(1) [t]he extent to which the jailhouse [witness'] testimony is confirmed

by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator of the alleged offense; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) [t]he circumstances under which the jailhouse witness initially provided information supporting such testimony to [the police] or a prosecutorial official, including whether the jailhouse witness was responding to a leading question.' P.A. 19-131, § 2." *State* v. *Leniart*, supra, 333 Conn. 165–66 (*Palmer, J.*, concurring in part and dissenting in part).

Of particular importance here is that P.A. 19-131, as amended by No. 19-132 of the 2019 Public Acts (P.A. 19-132), defines a "jailhouse witness" as "a person who offers or provides testimony concerning statements made to such person by another person with whom he or she was incarcerated, *or an incarcerated person who offers or provides testimony concerning statements made to such person by another person who is suspected of or charged with committing a criminal offense.*" (Emphasis added.) P.A. 19-132, § 6, codified at General Statutes (Supp. 2020) § 54-86o (d). Consistent with our holding today, the procedural protections embodied in P.A. 19-131 are not dependent on the location where the defendant's alleged statements occurred; instead, they are applicable regardless of whether an incarcerated witness testifies as to statements the defendant made inside or outside of prison. See id. By concluding that a "jailhouse informant" under *Patterson* and its progeny is the same as a "jailhouse witness" under P.A. 19-131 and P.A. 19-132, we create a harmonious body of law relating to the same subject matter, consistent with the intent of the legislature.[12]

In the present case, Shannon was incarcerated at the time he offered the state information regarding the defendant's confession to the victim's murder in exchange for leniency in his own criminal case.[13] Because Shannon was an incarcerated informant who offered and provided testimony about a criminal defendant's inculpatory statements, we conclude that he was a jailhouse informant for whom a special credibility instruction was required.[14] The trial court therefore improperly denied the defendant's unopposed request for a jailhouse informant instruction.

This does not end our inquiry, however, because we must determine whether the trial court's failure to charge the jury in accordance with the defendant's request was harmful. "As we previously have recognized, an instructional error relating to general principles of witness credibility is not constitutional in nature. . . . Consequently, the defendant bears the burden of establishing that the error deprived him of his due process right to a fair trial." (Citation omitted.) *State* v. *Patterson*, supra, 276 Conn. 471–72. "[A] nonconstitu-

tional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . Several factors guide our determination of whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which [the jailhouse informant's] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether [the informant's] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the informant's] testimony to the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 571–72.

The first factor favors the state here because, as the state points out, "the jury was well aware of Shannon's admitted motivational self-interest, the two and one-half year delay in Shannon coming forward, the fact of his incarceration, the pending charges that admittedly drove him to provide the police with information, and the benefits that he admittedly received from the police and the state before he testified, all of which were elicited during his examination and highlighted in the closing arguments of counsel." See *State* v. *Arroyo*, supra, 292 Conn. 572 (concluding that first factor favored state when "defense counsel cross-examined both [jailhouse informants] extensively as to their motive for testifying and addressed their incentive to lie in closing argument"); *State* v. *Slater*, 285 Conn. 162, 190, 939 A.2d 1105 ("the informant's potentially improper motive for testifying . . . amply was brought to the attention of the jury" because two witnesses testified about informant's deal with state and informant's motive to lie was emphasized by defense counsel during oral argument), cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); *State* v. *Patterson*, supra, 276 Conn. 472 ("the jury was well aware of the fact that [the jailhouse informant] had been promised certain benefits by the state in return for his cooperation against the defendant" because testimony was elicited on direct examination and cross-examination).

Turning to the second factor, we note that the trial court issued a general credibility instruction, which advised the jury that, when evaluating the credibility of a witness, it should consider, among other things, "any interest, bias, prejudice or sympathy [that] a witness may apparently have for or against the state, or the accused or in the outcome of the trial." Footnote 4 of this opinion. Although the trial court singled out Shannon's testimony for special consideration because he previously had been convicted of certain felonies; see footnote 5 of this opinion; the trial court failed to inform the jury of the other factors that it properly may consider when evaluating Shannon's credibility, namely, "[1] [t]he extent to which his testimony is confirmed by other evidence; [2] [t]he

specificity of the testimony; [3] [t]he extent to which the testimony contains details known only by the perpetrator; [4] [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; [5] [t]he informant's criminal record; [6] [a]ny benefits received in exchange for the testimony or providing information to the police or [the] prosecutor; [7] [w]hether the witness expects to receive a benefit in exchange for the testimony or providing information to the police or prosecutor, regardless of whether such an agreement actually exists; [8] [w]hether the witness previously provided reliable or unreliable information; [and] [9] [t]he circumstances under which the witness initially provided the information to the police or the prosecutor, including whether the witness was responding to leading questions." See also Connecticut Criminal Jury Instructions § 2.5-3, available at https://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited November 27, 2020). The second factor therefore stands in equipoise.

The third and fourth factors, which we consider conjunctively, militate in favor of the conclusion that the trial court's instructional error substantially affected the jury's verdict and deprived the defendant of his right to a fair trial. There was no physical evidence linking the defendant to the victim's murder, and the defendant's confession to Shannon was brief, nonspecific, and did not contain any details known only to the perpetrator. The sole evidence corroborating the defendant's confession was Teele's eyewitness testimony, but Teele suffered from credibility problems of her own in light of her self-interested motives arising from her involvement in the criminal justice system. Teele waited more than two years to inform the police that she had witnessed the victim's murder, and she came forward only after she had been "picked . . . up" on drug charges. Although there is no evidence in the record that the state dropped the charges against Teele in exchange for her testimony against the defendant, we previously have recognized that "there is frequently an implicit understanding that [an informant involved in the criminal justice system] will receive some consideration in exchange for testifying." *State* v. *Diaz*, supra, 302 Conn. 109; see also *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 603, 198 A.3d 562 (2019) (recognizing state's "practice of [entering into] informal, off-the-record leniency understandings with cooperating witnesses"). Teele was not a jailhouse informant, but her involvement in the criminal justice system raises "some of the same concerns that gave rise to our decision in *Arroyo* . . . ." *State* v. *Diaz*, supra, 109. The only person who corroborated Teele's testimony was Shannon, and the only person who corroborated Shannon's testimony was Teele. Given the interdependence of Teele's and Shannon's testimony, the critical importance of their testimony to the state's case, the long delay precipitating their decision to come forward

with information, and the powerful, personal self-interest that both witnesses had to testify against the defendant in light of their own involvement in the criminal justice system, the jury might have viewed both witnesses' testimony differently if it had received proper instructions on evaluating Shannon's credibility. We therefore cannot conclude that the trial court's improper refusal to issue the jailhouse informant instruction requested by the defendant was harmless.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for a new trial.

In this opinion PALMER, McDONALD and D'AURIA, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** December 1, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Martin Vincze, a police officer employed by the city of Bridgeport, testified that only one of the witnesses was willing to talk to the police about the shooting. Vincze explained that he was not surprised by the lack of cooperation because "[i]t's a common thing in housing complexes." Angela Teele, a resident of the housing complex at the time of the shooting, confirmed that, "for the residents in and around the Greene Homes housing project," there is a "general culture of not helping the police" or being a "snitch."

[2] At trial, Lawson testified that the defendant and the victim knew "of each other, but [did] not know each other like they were friends . . . ." Lawson's prior video-recorded statement to the police, in which she stated that the defendant and the victim knew each other, was admitted into evidence at trial as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). See, e.g., *State* v. *Simpson*, 286 Conn. 634, 641–42, 945 A.2d 449 (2008).

[3] Defense counsel requested the following special credibility instruction: "A witness who testified in this case, [Shannon], was incarcerated and was awaiting trial for some crimes other than the crime involved in this case at the time he first provided information to [the] police. You should look with particular care at the testimony of this witness and scrutinize it very carefully before you accept it. You should consider the credibility of this witness in the light of any motive for testifying falsely and inculpating the accused.

"In considering the testimony of . . . Shannon, you may consider such things as: [1] [t]he extent to which his testimony is confirmed by other evidence; [2] [t]he specificity of the testimony; [3] [t]he extent to which the testimony contains details known only by the perpetrator; [4] [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; [5] [t]he informant's criminal record; [6] [a]ny benefits received in exchange for the testimony or providing information to the police or [the] prosecutor; [7] [w]hether the witness expects to receive a benefit in exchange for the testimony or providing information to the police or prosecutor, regardless of whether such an agreement actually exists; [8] [w]hether the witness previously provided reliable or unreliable information; [and] [9] [t]he circumstances under which the witness initially provided the information to the police or the prosecutor, including whether the witness was responding to leading questions."

[4] The trial court instructed the jury in relevant part: "I now want to discuss the matter of credibility, by which I mean the believability of [the] witnesses. You have observed the witnesses. The credibility, the believability, of the witnesses and the weight to be given to their testimony are matters entirely within your hands. It is for you alone to determine their credibility. Whether or not you find the fact proven is not to be determined by the number of witnesses testifying for or against it. Again, it is the quality, not the quantity, of testimony [that] should be controlling. Nor is it necessarily so that you have to accept a fact as true because a witness has testified to it and no one contradicts it. The credibility of the witness and the truth of the fact are for you to determine.

"In weighing the credibility of the witnesses, you should consider the probability or improbability of their testimony. You should consider their appearance, conduct and demeanor while testifying and in court, and any interest, bias, prejudice or sympathy [that] a witness may apparently have for or against the state, or the accused or in the outcome of the trial. With each witness, you should consider his ability to observe facts correctly, recall them and relate them to you truly and accurately. You should consider whether and to what extent witnesses needed their memories refreshed while testifying. You should, in short, size up the witnesses and make your own judgment as to their credibility and decide what portion—all, some or none—of any particular witness' testimony you will believe based on these principles. You should harmonize the evidence as far as it can reasonably be done. You should use all of your experience, your knowledge of human nature and of the motives that influence and control human conduct, and you should test the evidence against that knowledge. You should bring to bear upon the testimony of the witnesses the same considerations and use the same sound judgment you apply to questions of truth and veracity, as they present themselves to you in everyday life.

"You are entitled to accept any testimony which you believe to be true and to reject either wholly or in part the testimony of any witness you believe has testified untruthfully or erroneously. The credit that you will give to any testimony offered is something [that] you alone must determine. If you find that a witness has intentionally testified falsely, you should keep that in mind and scrutinize the whole testimony of the witness. But it still remains up to you to accept or reject all or any part of the testimony. If you find that a witness has been inaccurate in some way, and you do not think that the inaccuracy was consciously dishonest, you can consider that inaccuracy in evaluating the rest of [the witness'] testimony. You know that persons sometimes forget things or they get something wrong. The significance you attach to a mistake may vary more or less with the particular fact as to which the inaccuracy existed or with the surrounding circumstances. Give to it that weight which your own mind leads you to think it ought to have, in which you would attach to it in the ordinary affairs of life [when] someone came to you in a matter and you found in some particular, he was inaccurate."

[5] The trial court instructed the jury in relevant part: "There was evidence that one witness, [Shannon], was previously convicted of certain felonies. This evidence is . . . admissible [only] on the question of the witness' credibility, that is, the weight that you will give his testimony. So a felony conviction bears only on [the witness'] credibility. It is your duty to determine whether any witness is to be believed wholly or partly or not at all. You may consider a witness' prior convictions in weighing his credibility, but it is still your duty to decide what weight to give to the convictions as you decide is fair and reasonable in determining the matter of credibility."

[6] The Appellate Court also rejected the defendant's claim that "[a] specific instruction on the dangers of eyewitness identification was required in this case"; (internal quotation marks omitted) *State* v. *Jones*, supra, 187 Conn. App. 765; reasoning that, because "both Teele and Shannon had known the defendant prior to seeing him on the night of June 21, 2010," their "identifications of the defendant did not give rise to the risk of misidentification that the defendant's requested instructions were specifically designed to address." (Footnote omitted.) Id., 770. The Appellate Court's holding on this point is not at issue in the present appeal.

[7] Alternatively, the defendant urges this court to "extend the rule of *State* v. *Patterson*, [supra, 276 Conn. 452], to *all* jailed informants who received a benefit for their testimony." (Emphasis added.) Because we agree with the defendant that a jailhouse informant instruction was required in the present case, even though Shannon testified about a confession that occurred outside of the prison context, we need not address the defendant's alternative request for an expansion of the *Patterson* rule.

[8] "'Under the complaining witness exception, when the complaining witness [himself] could . . . have been subject to prosecution depending only upon the veracity of his account of [the] particular criminal transaction, the court should . . . [instruct] the jury in substantial compliance with the defendant's request to charge to determine the credibility of that witness in the light of any motive for testifying falsely and inculpating the accused. . . . In order for [such a] request to be applicable to the issues in the case, there must be evidence . . . to support the defendant's assertion that the complaining witness was the culpable party.' " *State* v. *Diaz*, supra, 302 Conn. 102 n.6, quoting *State* v. *Patterson*, supra, 276 Conn. 467–68.

[9] "'[T]he inherent unreliability of accomplice testimony ordinarily requires a particular caution to the jury [because] . . . [t]he conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he testifies. When those conditions exist, it is the duty of the [court] to specially caution the jury.'" *State* v. *Diaz*, supra, 302 Conn. 102 n.7, quoting *State* v. *Patterson*, supra, 276 Conn. 468.

[10] The dissent points out that some states limit the definition of a jailhouse informant to "those individuals testifying to statements made by the defendant while the witness and the defendant were incarcerated together." See also footnote 2 of the dissenting opinion. This fact is unpersuasive, however, for three reasons. First, the practice of other states in this context varies widely, and there is no consensus; some states have adopted a limited definition of a "jailhouse informant," but many other states and scholarly commentators take a broader view. See, e.g., *Turner* v. *State*, 515 P.2d 384, 386 (Alaska 1973) (special credibility instruction is appropriate for "an interested witness," who "is usually either paid, or hoping for lenient treatment of his own crimes, or both" (internal quotation marks omitted)); *State* v. *Barksdale*, 266 Kan. 498, 513, 973 P.2d 165 (1999) (special credibility instruction is appropriate for "informant," which is statutorily defined as someone "who, in exchange for benefits from the [s]tate, acts as an agent for the [s]tate in obtaining evidence against a defendant" (internal quotation marks omitted)); A. Burnett, "The Potential for Injustice in the Use of Informants in the Criminal Justice System," 37 Sw. U. L. Rev. 1079, 1079 (2008) (jailhouse informants are "persons in custody or facing criminal prosecution who have an expectation of some reward in the form of reduction of charges, eligibility for bail, leniency in sentencing or better conditions of confinement" (internal quotation marks omitted)). Second, the dissent overlooks the fact that *federal* courts have determined that a special credibility instruction is appropriate for any cooperating witness who "provide[s] evidence against a defendant for some personal advantage or vindication, as well as for pay or immunity." *People* v. *Dela Rosa*, 644 F.2d 1257, 1259 (9th Cir. 1980); see also *United States* v. *Garcia*, 528 F.2d 580, 587–88 (5th Cir.) ("a defendant is entitled to a special cautionary instruction on the credibility of an accomplice or a government informer if he requests it" in order "to [e]nsure that no verdict based solely on the uncorroborated testimony of a witness who may have good reason to lie is too lightly reached"), cert. denied, 429 U.S. 898, 97 S. Ct. 262, 50 L. Ed. 2d 182 (1976), and cert. denied sub nom. *Sandoval* v. *United States*, 426 U.S. 952, 96 S. Ct. 3177, 49 L. Ed. 2d 1190 (1976). See generally 2A C. Wright & P. Henning, Federal Practice and Procedure (4th Ed. 2009) § 490, pp. 478–79 (special credibility instruction should be issued for "[a]n accomplice or informer, including one testifying under a grant of immunity"). Third, we are particularly disinclined to take guidance from the more restrictive practices adopted by a handful of other states when our own legislature has chosen a broader definition, which includes a witness who testifies as to a confession made outside of the prison environment. See Public Acts 2019, No. 19-132, § 6, codified at General Statutes (Supp. 2020) § 54-86o (d).

[11] We disagree with the dissent that a defendant's ability to cross-examine an incarcerated witness regarding "the circumstances surrounding the alleged confession" depends in any significant respect on *where* the alleged confession is heard. Regardless of where the alleged confession occurred, such testimony is "inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence." *State* v. *Diaz*, supra, 302 Conn. 109.

[12] The dissent believes that it is "unnecessary to harmonize" the legislative definition of a "jailhouse witness" with our understanding of a "jailhouse informant" because the legislature was not "invalidating our case law's definition as to jury instructions." This observation misses the mark. Though it is not *necessary* to harmonize the definitions, it certainly seems preferable to do so unless there is a good reason for us to reject the legislature's underlying policy determination. To be sure, P.A. 19-131 and P.A. 19-132 were not intended to prescribe rules regarding the issuance of special credibility instructions, but it is entirely appropriate that our views of proper instructional language should be informed by the choice made by the legislature to adopt a definition of "jailhouse witness" that is not dependent on the location of the defendant's alleged confession. We can think of no reason to employ a more restrictive definition than the one adopted by the legisla-

ture to address precisely the same policy concern, namely, the potential unreliability of a jailhouse witness' testimony concerning statements purportedly made by a criminal defendant. Pursuant to our decision today, the pretrial protections embodied in P.A. 19-131 for the testimony of a "jailhouse witness" will be coextensive with the trial protections afforded by the special credibility instruction for the testimony of a "jailhouse informant."

[13] Consistent with the legislative definition of a "jailhouse witness," we conclude that a special credibility instruction is required when a witness is incarcerated at the time he or she either "offers or provides" testimony regarding a defendant's inculpatory statements. P.A. 19-132, § 6. In either circumstance, there is a "need for caution" because the witness is in "the power of the state, is looking to better his or her situation in a jailhouse environment where bargaining power is otherwise hard to come by, and will often have a history of criminality." (Internal quotation marks omitted.) *State* v. *Arroyo*, supra, 292 Conn. 568–69 n.9. We disagree with the dissent that the expectation of "a *future* benefit" is the defining characteristic of a jailhouse informant. (Emphasis in original.) The *timing* of the sought after benefit is not critical because what matters is the witness' incentive to provide false testimony regarding a defendant's inculpatory statements. Indeed, we stated in *Arroyo* that a special credibility instruction is required regardless of whether the defendant has received, or expects to receive, a benefit. *State* v. *Arroyo*, supra, 569. We also disagree with the dissent that "the number of witnesses that would qualify as a jailhouse informant are endless . . . ." To the contrary, we hold today that a special credibility instruction is required only for those limited number of witnesses who are incarcerated at the time they offer or provide testimony regarding a defendant's confession to criminal wrongdoing.

[14] The state points out that Shannon was not only a jailhouse informant, but also an eyewitness who testified about events he personally observed. We agree with the state that Shannon's eyewitness testimony concerning the defendant's presence at the Greene Homes housing complex on the night of the victim's murder "can be compared with the testimony of other witnesses" and tested through cross-examination. *State* v. *Diaz*, supra, 302 Conn. 110. But Shannon did not provide only eyewitness testimony; he also provided jailhouse informant testimony regarding the defendant's confession to the murder of the victim. For the reasons explained in the text of this opinion, Shannon's jailhouse informant testimony does not share the same guarantees of trustworthiness as his eyewitness testimony, and, therefore, a special credibility instruction was required. See id., 96, 104–05 (assuming, without deciding, that "the trial court's failure to give a special credibility instruction for Ortiz," who testified as both eyewitness and jailhouse informant, "would have been improper under *Arroyo* if [Diaz] had requested such an instruction").